# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, COOPER, and SCHLACK
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private First Class STEFON M. REID**
**United States Army, Appellant**

ARMY 20220160

Headquarters, Joint Readiness Training Center and Fort Johnson
Scott Z. Hughes, Military Judge
Colonel Leslie A. Rowley, Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Major Mitchell D. Herniak, JA; Major Jake D. Nare, JA (on brief); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Captain Matthew S. Fields, JA; Major Jake D. Nare, JA (reply brief).

For Appellee: Colonel Jacqueline J. DeGaine, JA; Major Justin L. Talley, JA; Captain Joshua A. Hartsell, JA (on brief).

28 October 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

COOPER, Judge:

Appellant raises three issues on appeal, two of which warrant discussion, but no relief.

Appellant contends his trial defense counsel were ineffective for failing to introduce evidence of prior sexual activity between the victim and an outcry witness, who became the victim's husband shortly before trial began. Appellant also claims trial counsel committed prosecutorial misconduct by eliciting what appellant contends is misleading testimony about the relationship between the victim and the same outcry witness. We reject both arguments and affirm the finding of guilty and the sentence.

## BACKGROUND

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2019 ed.) [UCMJ].[1] The military judge sentenced appellant to a dishonorable discharge, confinement for three years, and reduction to the grade of E-1.

Appellant first met the victim in February 2021, when she was in-processing Fort Johnson. Over the course of the following months, appellant and the victim had minimal interactions.

In June 2021, the victim was doing laundry at her barracks. Appellant approached and offered to help, so the victim allowed him to carry her laundry back to her room. After arriving in her room, the victim began to clean, telling appellant she had friends coming over later that evening. Appellant asked if he could come over and the victim agreed. Appellant left the victim's room.

A short time later, appellant returned to the victim's room, to the victim's surprise. Appellant sat on the victim's bed as she continued cleaning and asked the victim about her relationship status. At some point, the victim became uncomfortable and told appellant she wanted him to leave, but he did not leave. Done cleaning, the victim sat on the end of her bed and began to watch television. Appellant moved up the bed and attempted to kiss the victim. The victim told appellant no, however, appellant grabbed the victim's face to try to kiss her.

The victim attempted to escape by partially rolling off the bed, but appellant got on top of her, and she could not get away. The victim tried to push appellant off of her, telling him "stop" and "no" over and over again. Appellant pinned her down, using his body to cover hers, pulled down her shorts, and penetrated her vagina with his penis. The victim continued to struggle, so appellant flipped her onto her stomach and penetrated her a second time. After appellant ejaculated onto the victim's back, he got up, got dressed, and then, left the room.

Once appellant left, the victim video called her cousin, and also talked to her aunt and her mother. During these calls, she was crying, shaking, and unable to speak coherently.

---

[1] Appellant was found not guilty of one specification of rape, in violation of Article 120, UCMJ.

The first outcry witness to see the victim in person after the sexual assault was Private First Class (PFC) ██ A substantial amount of evidence regarding PFC ██ and the victim's interactions and relationship status was admitted at trial.

Private First Class ██ and the victim met in February 2021 when in-processing Fort Johnson. At the time of the sexual assault, PFC ██ and the victim testified they were friends—he kept a gym bag at her barracks, the two went to multiple, private dinners, and he regularly borrowed the victim's car. Private First Class ██ also went to the hospital after the sexual assault to be with the victim, at her request. However, both he and the victim denied any romantic or "dating" relationship until December 2021, several months after the victim had left Fort Johnson.[2] Private First Class ██ and the victim were married in March 2022, the same week as the court-martial.

During the trial, the relationship status between the victim and PFC ██ at the time of the sexual assault was hotly contested. Both the victim and PFC ██ testified that at the time of the sexual assault, they were just friends and did not start "dating" until months later. One of the victim's friends, PFC ██, however, described the victim and PFC ██ as being "romantically together" in an "on and off again" fashion prior to the sexual assault occurring, and that the assault allegation brought the two closer. That same witness also averred the victim and PFC ██ were not "dating" and had "no labels" on their relationship.

During the initial investigation by the Criminal Investigative Division, PFC ██ told agents he was close friends with the victim and disclosed that he had been physically intimate with her a few times prior to the day of the sexual assault. This statement was never admitted at trial. Neither party provided notice of their intent to offer evidence of the sexual component of their friendship prior to the assault under Military Rule of Evidence [M.R.E.] 412.

## LAW AND DISCUSSION

### *A. Ineffective Assistance of Counsel*

This court reviews claims of ineffective assistance of counsel de novo. *United States v. Furth*, 81 M.J. 114, 117 (C.A.A.F. 2021). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient, and that appellant was prejudiced by

---

[2] In fact, PFC ██ testified that he was seeing other people at the time of the sexual assault, and as friends, he had talked to the victim about that.

the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). "[I]n assessing an ineffective assistance claim, we can analyze *Strickland*'s performance and prejudice prongs independently, and if appellant fails either prong, his claim must fail." *United States v. Soler*, ARMY 20210017, 2022 CCA LEXIS 268, at *6-7 (Army Ct. Crim. App. 9 May 2022) (mem. op.) (citing *Strickland*, 466 U.S. at 694). Because of this, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

"Prejudice is established by 'showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Soler*, 2022 CCA LEXIS 268, at *6 (citing *Strickland*, 466 U.S. at 687). In other words, appellant must show "'a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different.'" *Captain*, 75 M.J. at 103 (citing *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Even assuming arguendo deficient performance, appellant fails to establish prejudice. Appellant has not met his burden of demonstrating to a "reasonable probability" that a different outcome would have resulted if defense counsel sought to admit evidence of the prior sexual activity between the victim and PFC █

It was clearly established that the victim and PFC █ were close friends. Defense's theory of the case was the victim lied to PFC █ in an attempt to deny consensual sexual intercourse with appellant or to gain sympathy from PFC █ and improve their relationship. Defense introduced a substantial amount of evidence regarding their interactions to support this theory and to further argue some form of a romantic relationship existed between them at the time of the sexual assault.

The victim and PFC █ were questioned at trial multiple times about their interactions and relationship status by both parties and the military judge, and it was also discussed in closing arguments by both parties. The extent of their close friendship, the possibility they were "romantically together," as PFC █ testified, and the alleged impact this may have had on the victim's motive to fabricate was squarely before the factfinder for consideration.

Under the facts of this case, additional evidence of alleged sexual activity between the victim and PFC █ would have provided little, if any, probative value. Engaging in sexual activity does not per se establish a relationship as any more emotionally important to a person, nor does it inherently create a heightened motive

to fabricate. *United States v. Alston,* 75 M.J. 875, 882-83 (Army Ct. Crim. App. 2016) (recognizing the impact of emotional attachments on biases and motives, regardless of the romantic or sexual nature of the relationship). Therefore, in this case, the failure to admit evidence regarding the alleged sexual activity between the victim and PFC ██ around the time of the sexual assault did not result in material prejudice to appellant.

The defense counsel effectively impeached the victim and PFC ██, challenging their credibility multiple times throughout trial regarding their relationship status, not only through detailed cross-examination, but also through the victim's friend, PFC AM, who testified about the romantic relationship that existed between the two. This allowed defense counsel to argue during closing that the victim possessed a motive to fabricate based on her close relationship with PFC ██.

Finally, the government's case was strong. The victim provided detailed testimony of the sexual assault and the government presented compelling corroboration through her cousin, her mother, and PFC ██ Moments after the assault, the victim's cousin was on a FaceTime call with the victim and described her as "crying", "shaking", and being unable to talk. Her mother, who spoke with the victim on the phone shortly thereafter, testified she had never seen her daughter like that, "crying hysterically," a "cry I've never heard before" and of a scale from one to ten, regarding how hard she was crying, her mother rated her a "ten, 20."[3] Private First Class ██ testified when he spoke with the victim on the phone she was "in a state of, like, panic, and she was screaming and crying." When he arrived at her room, he described her "[i]n fear, kind of balled up a little bit . . . crying . . . not talking back to me . . . . I never seen her like her crying like that before." In addition, the government presented testimony of a sexual assault nurse examiner who conducted DNA swabs after the assault, and a forensic biologist who testified the DNA established a match with appellant.

Given the above factors, admitting evidence of sexual activity between the victim and PFC ██ would not have led to a different result, and accordingly, we find no prejudice to the appellant.

*B. Prosecutorial Misconduct*

The court reviews claims of "prosecutorial misconduct . . . de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees,* 79 M.J. 5, 9 (C.A.A.F. 2019). Under plain error review, the appellant bears the burden "of establishing (1) error that is (2) clear or obvious and (3) results in material

---

[3] The victim's mother testified that she was in Georgia when she spoke with her daughter. Based on how "hysterical" her daughter was, the mother packed a bag and immediately drove ten to eleven hours to Fort Johnson, Louisiana, to be with her.

prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014).

"Prosecutorial misconduct is action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*,a constitutional provision, a statute, a Manual [for Courts-Martial] rule, or an applicable professional ethics canon." *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (internal quotations and citations omitted). Government counsel:

> may prosecute with earnestness and vigor . . . [b]ut, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Prosecutorial misconduct is thus "behavior by the prosecuting attorney that 'oversteps the bounds of . . . propriety and fairness which should characterize the conduct of . . . an officer in the prosecution of a criminal offense.'" *United States v. Henderson*, 83 M.J. 735, 746 (Army Ct. Crim. App. 2023) (quoting *Berger*, 295 U.S. at 84).

Appellant argues the prosecution elicited misleading and potentially false testimony from the victim and PFC ▮ We disagree. The prosecution asked the victim and PFC ▮ multiple times whether they were in a romantic or dating relationship, to which they consistently answered "no." The prosecutor's questions did not produce false or misleading responses since, in this case, the occasional sexual activity between the victim and PFC ▮ did not equate to a romantic or "dating" relationship. This court has previously recognized there is a difference between a romantic relationship and a sexual relationship, and one does not presuppose the other. *Alston*, 75 M.J. at 883 ("[o]ne person's emotional attachment to another person is often fertile ground for examining biases and motives . . . . Mil. R. Evid. 412 would likely be triggered if a party tried using sexual behavior . . . as a proxy for establishing or inferring an emotional connection from which such a bias or a motive might flow.").

We find insufficient evidence to support appellant's contention the prosecution overstepped the bounds of propriety when asking about the relationship status between the victim and PFC ▮ The victim and PFC ▮ testified they were not in a romantic or dating relationship. PFC ▮ testified they were friends and he talked with the victim about the women he *was* "seeing." The victim similarly testified they were friends before the assault, and they did not start dating until months later. Defense presented a witness that disputed their testimony on this matter and put their credibility at issue. Conflicting testimony is not uncommon in a court-martial and it becomes a matter for the factfinder to weigh when reaching a

decision. However, the prosecution did not violate any legal norm or standard when asking about the existence of a romantic relationship, while knowing the two had been physically intimate in the past. We find no error, plain or otherwise, and therefore, no prosecutorial misconduct.

## CONCLUSION

On consideration of the entire record, the finding of guilty and the sentence are AFFIRMED.

Senior Judge FLEMING and Judge SCHLACK concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

7